**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

United States of America :
                        :
v.                      :        Case No. 3:05cr108 (JBA)
                        :
Jerome Breedlove        :

**Ruling on Defendant's Motion to Suppress Evidence [Doc. # 14]**

Defendant Jerome Breedlove was indicted on April 27, 2005 on one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The charge resulted from defendant's arrest by officers of the Hartford Police Department ("HPD") on December 29, 2004 for criminal trespass in the third degree, Conn. Gen. Stat. § 53a-109, and a search incident to his arrest which disclosed a pistol and ammunition. After his arrest, police officers obtained a written statement from defendant. Defendant now moves to suppress the seized firearm, ammunition, and his written statement, contending that his arrest for criminal trespass was not supported by probable cause and that the seized materials and his written statement are fruits of the unlawful arrest. See Def's Preliminary Mem. [Doc. # 15]. In opposition, the Government argues that the arrest was supported by probable cause, the search of defendant was thus a lawful search incident to his arrest, and therefore the fruits of that arrest and search should not be suppressed. See Gov't Response to Def's Motion [Doc. # 16]. The Court held an evidentiary

1

hearing on defendant's Motion on October 14, 2005, October 31, 2005, and December 5, 2005, which was followed by post-hearing briefing.  For the reasons that follow, defendant's Motion will be granted.

## I.    FACTUAL SUMMARY

Defendant was arrested by HPD officers Gary Hudson and Brian Wilkinson in a passageway on the east side of a building at 240-248 Farmington Avenue in Hartford on December 29, 2004 at 5:30 p.m.  See Def's Ex. 1 (incident report).  The premises at 240-248 Farmington Avenue hold a small strip mall consisting of one building with two restaurants, a hair salon, a photo shop, and an equipment rental store.  See Gov't Ex. 3, 5.  In front of the building, facing Farmington Avenue, are parking spaces which are perpendicular to the Avenue.  Id.  Farmington Avenue runs east to west and the premises at 240-248 Farmington Avenue are on the north side of the street.  Gov't Ex. 3.  The passageway in which defendant was arrested is bounded to the west by the building at 240-248 Farmington and to the east by a fence surrounding an apartment building called the Laurels.  See Def's Ex. 2; Gov't Ex. 5.

At each end of the parking area in front of the premises at 240-248 Farmington Avenue are signs reading "NO TRESPASSING PRIVATE PROPERTY – FOR 240-248 FARMINGTON AVE. – ALL OTHERS WILL BE TOWED AT OWNER'S EXPENSE."  See Gov't Exs. 3, 5, 6.  One sign

is posted on the west side of the property on a low brick wall that separates the premises from the premises directly to the west.  See Gov't Ex. 3.  The second sign is posted on the east side of the front facade of the building, directly to the right side of the entrance to the photo shop.  See Gov't Ex. 5.  At the rear of the building, a sign is posted which reads: "PARKING RESERVED FOR UPSCALE HAIR SALON UNAUTHORIZED VEHICLES WILL BE TOWED AT OWNER'S EXPENSE."  Def's Ex. 19.  Other than the two "no trespassing" signs posted on the front of the building, there are no other "no trespassing" signs posted anywhere on 240-248 Farmington Avenue.  Transcript of Suppression Hearing ("Tr.") at 173-74, 234-35.  Neither the rear entrance to the passageway nor the rear of the building at 240-248 Farmington Avenue nor the passageway itself is posted with any "no trespassing" signs, and a person entering the passageway from the north of 240-248 Farmington Avenue would not encounter any "no trespassing" sign until the person came out to the front of the building.  Id. at 235; Def's Ex. 4.

The passageway in which defendant was arrested provides access to/from other commercial and residential areas including: (1) the back parking lot for 240-248 Farmington Avenue, Tr. 106, 180, 186; Def's Ex. 4; (2) a walkway leading to an entrance on the west side of the Laurels apartment building, Tr. at 103, 177; Def's Ex. 2; (3) a passageway connecting the parking lot behind

240-248 Farmington Avenue to the Hartford Symphony building and
its parking lot, Tr. at 107, 110-12; Def's Exs. 5, 7, 8; and (4)
an apartment building at 41 Niles Street, which is directly to
the north of 240-248 Farmington Avenue.  An entrance on the south
side of 41 Niles Street is accessible from Farmington Avenue by
walking north through the passageway, Tr. 105-06, 178-79; Def's
Ex. 3.  The owner of 240-248 Farmington Avenue, Peter Vouthounes,
testified that people "frequently walk through th[e] passageway"
and "walk back and forth in that [passageway] as a normal daily
routine."  Tr. at 179.  Mr. Vouthounes also testified that if he
"saw a car driving back or a person walking down or coming from
the Laurels, or anywhere else, [he] wouldn't give it a second
thought," however if they were "writing graffiti or using drugs
or selling drugs or something [illegal] or standing . . . against
[his] building . . . [not] appear[ing] to be using it for
access," he would question them.  Id. at 196-97.  Mr. Vouthounes
did not believe he had any right to limit pedestrian traffic
through the passageway.[1]  Id. at 214-15.

   Mr. Vouthounes' problems with non-patrons using the parking
spaces in front of his building, see Tr. at 172, initially
prompted him to post the "no trespassing" signs on the front of

---

   [1]  By agreement between the joint owners of the passageway -
- Mr. Vouthounes and the owners of 41 Niles Street and the
Laurels – the passageway must remain open to "vehicular as well
as pedestrian use and for all lawful purposes except parking."
Def's Ex. 18A at 2.

the building, id. at 173-74.  He also had problems with loitering

and drug use and selling on his property.  See id. at 191, 203-

05.  In response to these problems, Mr. Vouthounes filed a

standing complaint with the Hartford Police Department,

to authorize police to prosecute criminal activity related to

"individuals continuously loitering, gambling, soliciting,

selling and using illegal drugs while blocking pedestrian traffic

and causing loud noise disturbances."  Gov't Ex. 2 (Hartford

Police standing complaint form); Tr. at 99-100, 190-92.

     At the time of defendant's arrest, Officers Hudson and

Wilkinson were members of the HPD's Community Response Division,

assigned to the Asylum Hill division and tasked with proactively

investigating community complaints and specific criminal activity

in targeted areas of the City.  Tr. at 36-42, 229, 232.  Officers

Hudson and Wilkinson were familiar with the premises at 240-248

Farmington Avenue and the area surrounding it, and were aware of

Mr. Vouthounes' standing complaint.  Tr. at 51-52; 252-53; Def's

Ex. 1 at 1.  They were also aware that individual complaints had

been made concerning "drug dealing out in front [of 240-248

Farmington Avenue,] various people using the building to use

drugs, selling drugs in front, loitering in front of the

entrances to the business, trespassing, [and] just hanging out."

Id. at 53; 252-53.  They had personally observed criminal conduct

including drug dealing at 240-248 Farmington Avenue.  Id. at 54,

58-59, 252-53.  The officers were familiar with the two "no

trespassing" signs on the front of the building at 240-248

Farmington Avenue and knew that these were the only signs in the

vicinity of the passageway that used the phrase "no trespassing."

Id. at 64-65, 114-15, 234-35.[2]  They were aware that neither the

north end of the passageway nor the rear of the 240-248

Farmington Avenue premises were posted with any "no trespassing"

signs, and knew that a person entering the passageway from the

north end, at the rear of 240-248 Farmington Avenue, would thus

not encounter any "no trespassing" signs until exiting.  Id. at

146-47, 234-35.

     In the late afternoon of December 29, 2004, Officers Hudson

and Wilkinson were patrolling the Farmington Avenue area and

observed Defendant and another man (Stephen Baugh) standing in

the passageway approximately 5-10 feet back from the building

facade on Farmington Avenue.  Id. at 69, 71, 236.  The men

appeared to the officers to be arguing, although the officers

could not hear what they were saying.  Id. at 67 (they were

"waiving their hands, their arms, pointing at each other, and

just kind of like aggressive expressions"), 240 ("due to the body

language it appeared there was something wrong").

---

     [2]  Officer Hudson mentioned a "no trespassing" sign that is
posted above the entrance into 41 Niles Street, see Def's Ex. 3,
but testified that it was his understanding "that that sign would
indicate only people who live at 41 Niles or visiting someone
there can enter through that door."  Tr. at 114.

Officers Hudson and Wilkinson pulled their patrol car into the passageway stopping just shy of the front facade of the building, leaving the headlights on.  Id. at 69-70, 240-42. Officer Hudson testified that when they pulled into the passageway, the men "stopped . . . just froze . . . looking at us."  Id. at 70.  As the officers approached on foot, Officer Hudson observed defendant and Baugh begin to walk away and ordered them to stop.  Tr. 245-46.  Officers Hudson and Wilkinson began questioning defendant and Baugh respectively.  While there is dispute about what questions were asked and precisely what answers were given by defendant and Baugh, the officers testified that their explanations of why they were there and where they were going "didn't make any sense [and] didn't go together."  Id. at 146, 271.  Additionally, Officer Hudson testified that "when [he] asked [defendant]. . . specifically whether he knew he was not to be there," defendant indicated that "he knew he was not to be there."  Id. at 84; see also Def's Ex. 1 (incident report) at 2 (defendant and Mr. Baugh "knew they were not to hang out on the property and was [sic] unable to give valid reasons as to why they were there today").

At this point, the officers arrested defendant and Mr. Baugh for criminal trespass in the third degree and searched them, uncovering in defendant's pockets the pistol and ammunition.  Tr. at 86; Def's Ex. 1 at 1.  After arresting defendant and Baugh,

the officers transported them to the police substation and
contacted ATF Agent James Hartman, who upon arrival read
defendant his <u>Miranda</u> rights, had defendant sign a <u>Miranda</u> form,
and ultimately obtained a written statement from defendant.  <u>See</u>
Tr. at 89-90, 133; Gov't Ex. 8 (signed <u>Miranda</u> form); Gov't Ex. 9
(written statement).

## II.   DISCUSSION

## A.   Standard

A warrantless arrest is lawful if it is supported by
probable cause.  <u>See</u> <u>United States v. Watson</u>, 423 U.S. 411, 417
(1976).  "Probable cause exists where the facts and circumstances
within [the police officers'] knowledge and of which they had
reasonably trustworthy information [are] sufficient in themselves
to warrant a [person] of reasonable caution in the belief that an
offense has been or is being committed."  <u>Brinegar v. United
States</u>, 338 U.S. 160, 175-76 (1979) (internal quotation and
citation omitted).  Courts use a "totality of the circumstances"
approach to determine whether probable cause existed.  <u>Ill. v.
Gates</u>, 462 U.S. 213, 230-31 (1983).  Thus, this Court reviews the
totality of facts and circumstances within the officers'
knowledge at the time they arrested defendant to determine
whether that knowledge was sufficient to justify a reasonable
person in believing that defendant was committing criminal
trespass in the third degree.

The Court finds that because of the known characteristics of the

premises, defendant could not, as a matter of law, commit third

degree trespass,[3] and it was not reasonable to believe that

defendant's presence on the premises with those known

characteristics violated the trespass statute or constituted any

other related criminal activity.[4]

---

[3]   The Connecticut statutes providing for criminal trespass
in the first and second degrees are not applicable because, inter
alia, defendant was not inside a building, was not given an order
to leave the passageway, and was not the subject of a restraining
or protective order.  See Conn. Gen. Stat. § 53a-107 ("A person
is guilty of criminal trespass in the first degree when: (1)
Knowing that such person is not licensed or privileged to do so,
such person enters or remains in a building or any other premises
after an order to leave or not to enter personally communicated
to such person by the owner of the premises or other authorized
person; or (2) such person enters or remains in a building or any
other premises in violation of a restraining order issued
pursuant to section 46b-15 or a protective order issued pursuant
to section 46b-38c, 54-1k or 54-82r by the Superior Court; or (3)
such person enters or remains in a building or any other premises
in violation of a foreign order of protection, as defined in
section 46b-15a, that has been issued against such person in a
case involving the use, attempted use or threatened use of
physical force against another person; or (4) knowing that such
person is not licensed or privileged to do so, such person enters
or remains on public land after an order to leave or not to enter
personally communicated to such person by an authorized official
of the state or a municipality, as the case may be."); Conn. Gen.
Stat. § 53a-108 ("A person is guilty of criminal trespass in the
second degree when, knowing that such person is not licensed or
privileged to do so, (1) such person enters or remains in a
building, or (2) such person enters or remains on public land.").

[4]   The Government has not claimed probable cause to arrest
defendant for any other crime and, as defendant notes, defendant
could not have been arrested for loitering because Connecticut
does not have a general loitering statute and the Hartford City
ordinance regarding loitering on private property requires a
prior order to quit loitering by the owner of the property or his
agent, which did not exist in this case.  See Ordinance § 25-8

**B.    Connecticut Criminal Trespass Statute**

Conn. Gen. Stat. § 53a-109(a) provides:

A person is guilty of criminal trespass in the third
degree when, knowing that he is not licensed or
privileged to do so: (1) He enters or remains in
premises which are posted in a manner prescribed by law
or reasonably likely to come to the attention of
intruders, or fenced or otherwise enclosed in a manner
designed to exclude intruders, or which belong to the
state and are appurtenant to any state institution; or
(2) he enters or remains in any premises for the
purpose of hunting, trapping or fishing.

There are thus two elements to the crime of criminal trespass in

the third degree: (1) knowledge by defendant that he is not

licensed or privileged to enter or remain in premises; and (2)

that the premises "are posted in a manner . . . reasonably likely

to come to the attention of intruders."[5]  The Commission Comment

to Conn. Gen. Stat. § 53a-109 provides:

This section . . . <u>aims at the intrusion into premises
which are posted, fenced or otherwise enclosed in a
manner designed to exclude intruders</u>.  It should be
noted that unfenced and unenclosed open premises are
not protected.  It may be argued that an intrusion into
such premises, where the actor knows that he is not
licensed or privileged to do so, is a willful violation
and should be punished.  The Commission, however,
rejected that argument . . .

Conn. Gen. Stat. § 53(a)-109, Comm'n Cmt (emphasis added).

---

[Doc. # 51, Ex. B].

    [5]   The Government makes no claim that the premises at 240-
248 Farmington Avenue were "posted in a manner prescribed by
law," or "fenced or otherwise enclosed in a manner designed to
exclude intruders," or "belong[ed] to the state," or stood
"appurtenant to any state institution."

C.   **Probable Cause**

At the time of defendant's arrest, Officers Hudson and

Wilkinson were aware of Mr. Vouthounes' standing complaint about

criminal activity on his property.  Tr. at 53, 252-53; Gov't Ex.

1; Gov't Ex. 2.[6]  They were familiar with the premises at 240-248

Farmington Avenue and the areas surrounding it, knew of criminal

activity in the area, and knew that the only "no trespassing"

signs conceivably applicable to the passageway were the two

posted on the front facade of 240-248 Farmington Avenue, which by

their placement and content indicated they were directed at non-

patron parking in the area in front of the building.  Tr. at 64-

65, 114-15, 234.  They were also aware that there was no posting

forbidding trespassing located in the passageway itself or at the

rear of 240-248 Farmington Avenue.  They knew that the alley was

a through passageway open on both ends, with no barriers, fences,

or other enclosures.  Id. at 146-47, 234-35.  They also knew that

access could be gained into the passageway from the west entrance

to the Laurels, the south entrance of 41 Niles Street, the

passageway from the Hartford Symphony building and parking lot,

and from Niles Street, and that no posting relative to those

access points existed.  Both officers testified that persons

---

[6]  While defendant argues that the standard standing
complaint form does not mention "trespassing," the officers
testified that trespassing was among the problems they were aware
of.  Tr. at 53, 252-53.

approaching the passageway from locations other than from the Farmington Avenue end would not encounter any "no trespassing" sign.  Id. at 146-47, 234-35.  Importantly, the officers also knew that pedestrians commonly used the passageway.  Id. at 103-06, 112-13, 121-23, 233-34, 266.

The passageway was thus not posted so as to bring a person's presence there within the strictures of the trespass statute because the passageway was not "posted in a manner . . . reasonably likely to come to the attention of intruders," Conn. Gen. Stat. § 53a-109(a), or "posted, fenced or otherwise enclosed in a manner designed to exclude intruders," id. Comm'n Cmt.  It was not reasonable for Officers Hudson and Wilkinson to believe it was unlawful for defendant to stand in that passageway since they knew that a person entering the passageway from any point other than Farmington Avenue would not encounter any prohibitory signage, that the "no trespassing" signs located at opposite ends of the area in front of 240-248 Farmington used for parking for store patrons also warned, "ALL OTHERS WILL BE TOWED AT OWNERS EXPENSE," and that pedestrians regularly used that passageway without restriction, i.e. that the area in which defendant was standing was not "posted in a manner reasonably likely to come to the attention of intruders."[7]  While the officers knew they were

_____

    [7]  Compare State v. Ward, 83 Conn. App. 377, 849 A.2d 860 (Conn. App. Ct. 2004) (jury was justified in concluding that the entranceway to a building was properly posted pursuant to Conn.

patrolling a high crime area and likely suspected that defendant

and Baugh were up to something, that is insufficient for probable

cause to arrest defendant for trespass on inadequately posted

premises known to be generally open to public transit.[8]

Thus, because it was not reasonable to conclude that the

passageway was "posted in a manner reasonably likely to come to

the attention of intruders," the officers lacked probable cause

to arrest defendant without a warrant for criminal trespass and,

---

Gen. Stat. § 53a-109, where the entrance had a "no trespassing"
sign posted outside it and defendant had to force the door open).
Courts in other states construing similar statutes have concluded
that failure to post restrictions or exclusions at all entrances
into a property provides insufficient notice to would-be
trespassers.  See, e.g., People v. Powell, 180 Misc. 2d 627, 691
N.Y.S.2d 263 (N.Y. Sup. Ct. 1999) (courtyard was "open to the
public" where there were two entrances from the street and one
from a tunnel and the entrances were not blocked by gates or
other barriers and no signs were posted in the area informing
those who came into the courtyard that they were not permitted
entry or that access to the courtyard was limited); David Lee
Boykin Family Trust v. Boykin, 661 So. 2d 245 (Ala. Civ. App.
1995) (placing two signs at two gates on approximately 2,100
acres of woodlands did not constitute posting "in a conspicuous
manner" for purposes of the criminal trespass statute); State v.
McMechan, 48 Ohio App. 3d 261, 549 N.E. 2d 211 (Ohio Ct. App.
1988) (reversing conviction of criminal trespass where there was
no showing in the record that defendant's point of entry into a
university park contained some form of communication of the
restrictions upon its use).

[8]  Defendant's apparent belief that he should not be in the
passageway was thus erroneous because the passageway was not
adequately posted.  In any event, because the Court concludes
that it was not reasonable for the officers to conclude that the
passageway was adequately posted, the Court need not reach the
second element, namely whether it was reasonable to believe that
defendant entered or remained in the passageway "knowing that he
was not licensed or privileged to do so."  See Conn. Gen. Stat. §
53a-109(a).

accordingly, their warrantless search of defendant was unlawful as not incident to a lawful arrest.[9]  Katz v. United States, 389 U.S. 347, 357 (1967) (warrantless searches "are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions").

## D.  Suppression

Evidence will be suppressed as a "fruit" of an unlawful arrest, "whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention."  United States v. Crews, 445 U.S. 463, 470 (1980).  Thus, because there was no probable cause for defendant's arrest, the firearm and ammunition seized in the search incident to the unlawful arrest must be suppressed.  See id.  Defendant also seeks suppression of his written statement as a "fruit" of the unlawful arrest.  See Def's Post-Hearing Mem. at 37 (citing Wong Sun v. United States, 371 U.S. 471, 486 (1963)).

---

[9] The parties also addressed in their briefing, upon request from the Court, whether the search of defendant could be justified as a Terry frisk.  The Court concludes that the search of defendant cannot be so justified because neither of the officers articulated a reasonable belief that defendant was armed and dangerous, as required to justify a Terry frisk (see United States v. Casado, 303 F.3d 440, 444 (2d Cir. 2002)) and the search of defendant was conducted after his arrest, not upon the first arrival of the officers in the passageway, suggesting that the officers had no such fear.

Confessions obtained after an illegal arrest will be suppressed

"unless the confession was 'an act of free will [sufficient] to

purge the primary taint of the unlawful invasion." Kaupp v.

Tex., 538 U.S. 626, 632-33 (2003) (quoting Wong Sun, 371 U.S. at

486).

The Government appears to concede that if there was no

probable cause for defendant's arrest, then defendant's written

statement, as well as the seized firearm and ammunition, must be

suppressed, because its only argument concerning suppression is

that "the underlying arrest was supported by probable cause."

See Gov't Post-Hearing Mem. at 14-15.  Even without this

concession, however, the statement must be suppressed because the

Government has not demonstrated that the "taint" of the unlawful

arrest was sufficiently "purge[d]" such that the confession

constituted an act of free will on the part of defendant.  See

Kaupp, 538 U.S. at 633 ("Demonstrating such purgation is, of

course, a function of circumstantial evidence, with the burden of

persuasion on the State.").  Notwithstanding the fact that

defendant was given his Miranda warnings, the Government has not

established that sufficient time elapsed or "intervening

circumstances" occurred so as to remove the taint of the unlawful

arrest such that defendant's confession constituted an act of

free will.  See Brown v. Ill., 422 U.S. 590, 603-04 (1975).

Miranda warnings do not act as a "cure-all," rendering voluntary

all confessions obtained after illegal arrests, searches, and

seizures, because such a rule would reduce "the constitutional

guarantee against unlawful searches and seizures . . . to a form

of words."  Brown, 422 U.S. at 602-03.[10]

In this case, defendant was arrested around 5:30 p.m., see

Def's Ex. 1 (incident report), he was transported to the Hartford

Police Substation about 10 minutes thereafter, see Tr. at 132-33,

and he signed a written waiver form at 7:23 p.m. and the written

statement at 7:50 p.m, see Gov't Exs. 8, 9.  Between the time

that defendant arrived at the Police Substation and the time that

he was questioned by Agent Hartman, defendant waited in a holding

cell, did not meet with a lawyer or make any phone calls, and did

not speak with anyone other than law enforcement officers.  See

Tr. at 133.  Thus, as was the case in Brown, Dunaway, and Taylor,

there was no intervening event between defendant's illegal arrest

---

[10] See also Taylor v. Ala., 457 U.S. 687 (1982) ("In Brown
and Dunaway, this Court firmly established that the fact that a
confession may be 'voluntary' for purposes of the Fifth
Amendment, in the sense that Miranda warnings were given and
understood, is not by itself sufficient to purge the taint of the
illegal arrest."); Dunaway v. N.Y., 442 U.S. 200, 218-19 (1979)
(fact that defendant was given his Miranda warnings and his
statement was "voluntary" for Fifth Amendment purposes, did not
render his statement admissible where "[n]o intervening events
broke the connection between [his] illegal detention and his
confession.  To admit [defendant's] confession in such a case
would allow law enforcement officers to violate the Fourth
Amendment with impunity, safe in the knowledge that they could
wash their hands in the procedural safeguards of the Fifth.")
(internal quotation and citation omitted).

and search and his confession to "purge" the taint of the arrest

and search or allow defendant to "consider carefully and

objectively his options and to exercise his free will." Taylor,

457 U.S. at 691.  That approximately two hours elapsed between

defendant's arrest and his confession has not been shown to be

sufficient to render his statement admissible.  See Brown, 422

U.S. at 604 (statement was fruit of illegal arrest where it was

separated from the arrest by less than two hours and there was no

intervening event "of significance whatsoever").  Accordingly,

defendant's written statement, as well as the seized firearm and

ammunition, will be suppressed.[11]

## III. CONCLUSION

For the foregoing reasons, defendant's Motion to Suppress

Evidence [Doc. # 14] is GRANTED.

IT IS SO ORDERED.

     /s/
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 24th day of March, 2006.**

---

[11]  Defendant also argues that any other oral statements made post-arrest should also be suppressed.  However, neither party identifies any such statements and defendant has offered no evidence of or argument about the content or circumstances of these statements from which the Court can consider whether they were also the product of the unlawful arrest.  Accordingly, the Court declines to suppress any such oral post-arrest statements at this time.